**STATE of Missouri, Respondent,**

v.

**Andrew Jackson WALKER, Appellant.**

**No. 51605.**

Supreme Court of Missouri,
Division No. 2.

June 12, 1967.

Motion for Rehearing or to Transfer to Court
en Banc Denied July 10, 1967.

Norman H. Anderson, Atty. Gen., Jefferson City, David G. Dempsey, Asst. Atty. Gen., Clayton, for respondent.

James W. Farley, Farley, R. B. Miller, Jr., Platte City, for appellant.

Stanley D. Rostov, Marvin J. Brenner, Kansas City, for Greater Kansas City Civil Liberties Union, amicus curiae.

BARRETT, Commissioner.

On April 29, 1964, Hattie Biscoe, in her 80's, and her daughter, Marion Biscoe, 67, were found dying, Hattie in Marion's Ford automobile parked on route KK and Marion alongside the embankment of an obscure lane into the Smith Cemetery in Platte County. Hattie had been shot in the back of the head and was slumped out of sight in the seat of the Ford. Marion had been ravished and shot in the back of the head. Marion died alongside the lane and Hattie died after removal to the Smithville Hospital about seven miles southwest. The appellant Andrew Jackson Walker, a Negro age 39, with five prior felony convictions, three alleged here—forgery, larceny, attempted robbery—was charged with Marion's murder, found guilty by a jury and sentenced to life imprisonment by the court.

An affidavit for Walker's arrest was issued on June 15, 1964, and, according to his brief, he was arraigned on that day

before the magistrate of Platte County who appointed three members of the Platte County Bar to represent him. In background of the claims made here it should be noted in passing that these three lawyers made thorough investigation and preparation, they filed numerous motions, took depositions, employed available discovery procedures and safeguarded the appellant's rights by every possible means as finally evidenced by a six-day trial, a 1200 page record, and their brief and argument here. Since it has been deemed proper to comment on appellant's counsel perhaps it is only fair to say that there was also thorough and complete police-highway patrol-sheriffs' cooperation and investigation and a well-organized vigorous prosecution led by an able assistant attorney general. A month after arraignment and appointment of counsel, July 14, 1964, there was a preliminary hearing after which the magistrate bound Walker over to the Circuit Court of Platte County. An information charging murder in the first degree was filed on September 4, 1964, he was arraigned in circuit court and entered a plea of not guilty on September 8, 1964, and was tried May 3 through May 8, 1965. In addition to his diligent court-appointed counsel Walker has also been represented in this court by the Greater Kansas City Civil Liberties Union who joined in briefing and arguing this appeal.

There are three or four collateral points in the appellant's brief but they are without citation of authority, in one or more instances there were no proper or timely objections, and in any event these subsidiary points are encompassed in the principal arguments of both appellant's counsel and the civil liberties union and will be disposed of inferentially or in passing. One matter not involved here, particularly with respect to the one and only written statement given by the appellant, is that there was a preliminary and formal motion to suppress evidence and a hearing in which eleven police officers were called, there was no other testimony upon the motion, and the court found that "the statement," meaning

the written statement, was voluntary and therefore this appeal is not concerned with the problems of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, and Sims v. State of Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593. In substance these are the abstractly stated points relied upon: (1) that the court erred in admitting in evidence "any written or oral statement, admission or confession of appellant for the reason that appellant was not properly advised of his constitutional rights before or during interrogation by the State," (2) that any statements appellant may have made were invalid for the reason that the state failed to appoint counsel "at the proper time and stage of the proceeding," and (3) that the court erred in admitting in evidence any statements or admissions appellant may have made because in violation of his constitutional rights he was, his counsel assert, "interrogated continuously for approximately 36 hours without rest, was kept without sleep for 56 continuous hours" and after one night's sleep was again "continuously interrogated for four consecutive days" by law enforcement officers, all members of the regional Metro Squad, sheriffs and police officers in the several counties in both Kansas and Missouri in the Kansas City area, a law professor-criminologist, Mr. Duane A. Nedrud, (who incidentally was one of several lawyers arguing the Miranda v. State of Arizona and Johnson v. State of New Jersey cases) and a psychologist trained in the techniques of interrogation, Dr. Virgil W. Harris, a clinical psychologist.

In support of these arguments counsel have cited, sometimes without discrimination, an overwhelming list of cases but in essence the problem here is whether upon the "totality of the circumstances" *of this record* the rules and guidelines of these recently decided leading cases have been infringed; Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882; Davis v. State of North Carolina, 384 U.S.

737, 86 S.Ct. 1761, 16 L.Ed.2d 895; Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423, and Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192. And while this case was tried in May 1965 and is not directly controlled by Miranda v. State of Arizona the case is "relevant on the issue of voluntariness" of any confession or admission. Clewis v. State of Texas, 87 S.Ct. 1338, 18 L.Ed.2d 1. c. 426. And of interest here is the fact that Miranda v. State of Arizona involved four separate cases of "custodial police interrogation," one of which, Westover v. United States, involved a Kansas City police arrest and interrogation. And, contrary to an inferential contention by the state here, "No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense"—the privilege is against self-incrimination in any manner and there is no distinction in "inculpatory statements and statements alleged to be merely 'exculpatory,' " the court could have employed the word "incriminatory" rather than "inculpatory." Miranda v. State of Arizona, 384 U.S. 1. c. 477, 86 S.Ct. 1602. Having thus indicated an awareness of the rules and controlling guidelines the question, as indicated, is whether upon the totality of the circumstances of this record there has been an infringement of these governing principles and therefore an invasion of Walker's constitutional rights so as to compel the granting of a new trial. From almost every standpoint the case conveniently divides itself into two periods in point of time, some of which it is difficult to precisely pinpoint, (a) between April 29, 1964, when Hattie and Marion were found dying, and June 7, 1964, when the appellant was arrested and gave the only written statement and (b) the circumstances and events of the in-custody police interrogation following the giving of the statement to his arraignment in Platte County and the appointment of counsel and, finally, all correlated and evaluated within the context of his testimony upon this trial.

James DeVeney, for 14 years a farmhand on David Miller's farm, by reason of a series of events did not start out to feed the hogs in the field just south of the Smith Cemetery on April 29th until almost 2 o'clock in the afternoon, at that time he left the Miller home on the east-west gravel road, known in this record as the Little Platte Church Road, in a pickup truck and traveled west one-half mile to the first north-south gravel road, a T intersection, and just as he turned the corner met Lloyd Allmon in a Skelly gas truck. They waved and passed and "just over the top of the hill" on the left side of the road (and just north of the lane into the Smith Cemetery) DeVeney saw an automobile which he described as "white on top" and "blue on the bottom." He saw "somebody move in the car" and as he approached "somebody just ducked over out of sight." He was unable to see the person and he could not identify the make or model of the automobile. After passing the automobile he turned right into the cemetery lane and immediately came upon "that woman lying on the left side of the road * * * shaking her head back and forth * * * and blood was running down her face." DeVeney was frightened and so he drove to the end of the lane, turned around, and "slowed up a little" as he again passed the wounded lady and "took off for the Miller farm as quick as I could." On the way out he noted that the automobile he had seen on the north-south road was no longer in sight. DeVeney reported these events to Mr. Miller who called the sheriff's office. He then waited at the T intersection until a deputy sheriff and an ambulance arrived and he directed them to the body of Marion Biscoe who by that time was dead.

About 2 o'clock, also by an unusual chain of events, Allmon left home in his Skelly gas truck and on the north-south road about 150 yards north of the cemetery lane came upon an automobile "sitting by the side of the road." He thought it was an "Olds," two-tone, white over blue. There was a man in the front seat of the automobile and

as he approached "the man glanced away from me; turned his head to the right" but Allmon saw that it was "a colored man." Allmon delivered oil to the David Miller farm, proceeded east on the Little Platte Church gravel road to the next gravel road, a north-south road known as County Line Road and he traveled that road into route KK and finally to Green's garage on 169. As he was about to drive into Smithville he met highway patrolman Roberts and they drove east on KK until they came upon Marion Biscoe's white Ford, the window on the passenger side shattered, and there found Hattie Biscoe unconscious.

Hattie and Marion lived in Camden Point, northwest of this area, and had been to the hospital in Smithville, Hattie to pay a bill and Marion to refill a prescription. They were last seen leaving the hospital in Marion's white Ford about 1:30 traveling west into Highway 169. (It took a highway patrolman ten minutes at 35 miles an hour to drive from the place on KK where Marion's Ford was found to the hospital in Smithville.) A few minutes later, 1:30 or 1:35, a carpenter who lived "west of the covered bridge," on his way to Smithville saw the white Ford, with the broken glass parked on KK about 100 feet east of the first north-south gravel road but he saw no one and did not stop.

On that day, April 29, Berniece Stobaugh was painting a "farm bell" at Lyle Brown's home on the Little Platte Church Road, one and one-half miles east of the north-south road near the cemetery, and about 2:15 heard a "grating and grinding" on the road and saw an automobile from the west traveling "with a low tire on the rim." She did not look at the driver of the automobile and did not know its make but "it was a light top over greenish-blue bottom." On that day Highway 169 north of Smithville was under repair and between 2:30 and 2:45 a 1957 Buick special "white over blue" came upon the workmen and Billy Brown, directing one-way traffic, asked the driver "why he wasn't fixing his tire." The driver said that "the car didn't belong to him" but he was going to make it on down "to the station and fix it." Billy identified the appellant Walker as the driver of the automobile and subsequently identified him in a lineup in Kansas City. At approximately 2:30 Walker drove his 1957 Buick "whitish color over light green or blue" into Clower's Standard Service on Business 169, just outside Smithville, and Leo George repaired a right front tire with an NR-3 patch after unsuccessfully attempting to sell him some used tires. Walker drank "a bottle of pop," bought a pair of sunglasses for $2.00, paid his bill of $1.50 and drove off south on 169. Leo subsequently identified the appellant in a police lineup and at the trial examined a tire and identified the NR-3 patch.

About 3:15 Sheriff Lowmiller made a search along the north-south road and found a lady's leather billfold with two receipts in it, one from the Smithville hospital and the other from the Camden Point Bank. Another member of the Metro Squad, from Kansas City, Kansas, on the morning of April 30, on the Little Platte Church Road, about one mile from the T intersection, found Marion's checkbook on the south side of the road. Lieutenant Laurie, from St. Joseph, on this same trip, at the first crossroad east of the T intersection, found several articles among which was a fresh, empty, sixteen-ounce Budweiser beer can —the only one in the searched area. This beer can together with other exhibits was taken by plane to Washington, D. C., and Mr. Goodreau, an F.B.I. fingerprint examiner, lifted and developed from the can Walker's right thumbprint. On the County Line Road, opposite H and H Lake, Marion's patent leather purse and a Sears sales slip were found.

As stated, both women were shot in the back of the head, the entrance wounds were described as "contact wounds," the gun barrel had been placed directly against their skulls. During an autopsy the pathologist removed a .38 caliber leaden bullet from the back of Hattie's skull. The bul-

let that passed through Marion's skull was never found. And, incidentally, the murder weapon was never found. But from the contact wounds the pathologist was able to recover metal fragments from the skulls of both women and thus from the fragments it was established that Marion was also shot with a leaden bullet identical with the one removed from Hattie's skull.

Irrespective of any statements or admissions or other evidence connected with custodial interrogation, in addition to the appellant's thumbprint on the beer can, one of the most telling and incriminating circumstances appeared from the testimony of Odie McGlothen. Odie was employed at the Blue Valley Foundry in Kansas City, Walker was "going with" his niece and in November or December 1963 Odie got Walker a job at the foundry. He rode to work with Odie until he purchased his white over green 1957 Buick. Odie did not remember the date of the Biscoe murders but "we was setting out at lunch" at the foundry "talking about the murder" and Walker said, "Well, he said that the police had asked him about the color of his car, and he was going to change the color." On June 7th mere inspection of the appellant's white over green Buick revealed that the lower part of the automobile had been painted black over the green, "a pretty crude job," and in the trunk of the automobile there was a can of "lacquer aerosol type spray paint."

One month and seven days after the death of the Biscoe women, shortly after 3 a. m. on Sunday, June 7, 1964, Officer Hickman received a radio message and proceeded to 18th Street and Montgall where he "observed a colored man (Walker) coming from behind a grocery store." Walker got in his 1957 Buick, parked on Kansas Avenue, and after a chase of several blocks Hickman, soon with the aid of Officer King, succeeded in stopping the Buick and arresting Walker. By 3:30 or 3:40 they arrived at No. 3 Police Station on Independence Avenue where King alone, without advising of his rights to silence

or counsel, talked to Walker for about one and one-half hours about "a burglary that was committed at Eighteenth and Agnes; a purse snatch had occurred that night—one o'clock in the morning, and an armed robbery had occurred at 10:00 o'clock on the 6th" but the Biscoe case was not mentioned. The only mention of the Biscoe case was by Hickman, apparently as he "booked" Walker at 5:30 or 5:40, when he blurted "why he killed those people over north." Walker replied, "No, man, you ain't going to lie on me." At 6:00 o'clock Walker was taken to police headquarters at 12th and Locust Streets where he was fingerprinted and placed in a cell on the eighth floor by Patrolman Cahill. At 8:35 a member of the crime against property unit (not connected with the Metro Squad) questioned Walker about "an incident that happened the night before," a robbery and a "purse snatch," but again the Biscoe case was not mentioned and he was returned to his cell at 9:00 o'clock. This officer says that he apprised Walker of his right to silence and to an attorney and his testimony on the motion to suppress was not disputed. Definite and specific charges, hours and details do not appear, perhaps in fear of getting before the jury other offenses in which there had been no convictions, but on Monday, June 8, 1964, at 2:50 in the afternoon Walker was taken before a magistrate and "arraigned on several charges pending against him in Kansas City, Missouri." Officer DeGraffenreid, the Negro policeman who escorted him to magistrate court, inquired if he would like to talk to his mother or "see if she could provide counsel for him" but he declined the offers.

The first and intensive in-custody interrogation with reference to the Biscoe murders began with Detective Johnson, in charge of polygraph, at 3:55 p. m. on June 7 with no one else present. He said that he did not advise Walker of his right to an attorney but he did tell him "that this was a voluntary thing; that he did not have to submit to questioning;" but Walker "told me that he knew what his rights

were." At the outset Walker not only denied killing the Biscoe women but he said "that he had not been in Platte City in the past year; he further told me that he had not been in Smithville since 1960." (Walker was born in Plattsburg in Clinton County about 20 miles northeast of Smithville, had relatives there and "some years back," according to him, had fished and hunted in the area.) After having first denied that he had been in the Smithville area since 1960 he told Johnson that he was on the north-south gravel road and in the Smith Cemetery area on April 29 and he said that on the gravel road he noticed a scarf and piece of paper and stopped and examined them. He also said that he had had a flat tire repaired in Smithville. On direct examination his explanation of his denial and then admission that he had been in the area was "because my record is too bad; I didn't want to become implicated in nothing of this sort." Johnson quit talking to Walker at 6:55 and did not see him again until June 9 at 8 o'clock with Dr. Harris.

In the meanwhile between 7:15 p. m. and 12:30 a. m. "with some breaks, of course," Lieutenant Shannon and Chief Beeler of Raytown interrogated Walker. This interrogation culminated in Walker's reading, correcting and finally signing, at 11:30, a written statement witnessed by Shannon, Beeler, White and DeGraffenreid. Shannon said that he first introduced himself to Walker, told him what he was there for "and that he did not have to make any statements to me; that any statement that he might say could be used against him in any court of law * * * that he was entitled to an attorney for counsel, or for a friend for advising." Later in the evening when advised again of his rights he said to Beeler "that he had been over the route before; he knew he was entitled to an attorney, and when he got ready for an attorney he would let me know." About twenty minutes after this interview started Walker talked to his mother on the telephone. Also there were two breaks of about

thirty minutes each when he was placed in lineups, then there was a break or two when he went to the bathroom and one when Chief Beeler brought cigarettes. And then, as he agrees, during the interview "all of us, had chicken and potatoes, rolls, coffee." Walker testified that there were no promises, threats or mistreatment, he said "they were nasty nice; they have a little way of being nasty nice." By 11:30 he agreed to give a statement, Shannon prepared it from his notes, and shortly after 12 he signed it.

The statement need not be set out here, the Biscoe murders are not mentioned in it. The statement simply accounts for Walker's whereabouts beginning with 5:30 a. m. on April 29, 1964, his trip from Kansas City in his Buick automobile to Platte County to hunt groundhogs, his purchase of Budweiser beer, his route, 71 Highway to 92, right on 92 to B and the bridge, east on KK to the gravel road north and then into a "private lane" which he did not admit was the cemetery lane. And when he testified, as in the statement, he said he met a pickup truck, he admitted tossing out a beer can, he told about his flat tire, encountering the road crew and his having the tire fixed and of buying the sunglasses and finally back to Kansas City. Except for denying that the east-west lane he was on was the one into the cemetery, there is nothing in the statement that he did not freely and voluntarily testify to as a witness on his own behalf and in the end he briefly narrated all the circumstances as testified to by the state's witnesses as they have been detailed from the outset of this opinion.

 And so as to the first period of time, between April 29, 1964, when Hattie and Marion were found dying and June 7, 1964, when appellant was arrested and gave the written statement at midnight, in all these circumstances as the court said in another murder case, "Ussery himself removed any objection to admitting the confessions in evidence by testifying to

the matters contained in them, thus confirming their truth. Involuntary confessions are rejected as evidence because they are regarded as testimonially unreliable and untrustworthy. 23 C.J.S. Criminal Law § 817(2), pp. 164, 165. Yet when the truth of a confession is established by the very person who made it under such solemn circumstances as on oath in open court, he may not be permitted to claim error because of the use of the confession on the ground it was involuntary," and, a fortiori there is no manifestly prejudicial invasion of constitutional rights. State v. Ussery, 357 Mo. 414, 416–417, 208 S.W.2d 245, 246–247; State v. Brown, Mo., 404 S.W.2d 179, 182, and the list of cases there cited.

As to the second period of time following the giving of the statement, on June 8, after warnings of right to counsel and of silence, including an offer to take a lawyer on the trip, members of the Metro Squad took Walker to Platte County and traveled over the route described in his statement. They left Kansas City about 8 o'clock, ate lunch in Platte City about 11:30 and were back in Kansas City by 1 o'clock. No one as a result of that trip testified to any fact or circumstance bearing materially on the case. On June 9 Chief Beeler and a detective returned to Platte County with Walker and on that occasion about 11 o'clock Dr. Harris, the clinical psychologist, appeared and was introduced to Walker as one "who was there to talk to him about the Biscoe case." They drove out to the north-south gravel road and Walker and Harris "walked down the lane" to the cemetery, talking, for the first time, probably thirty minutes. They drove on to Smithville and were back in Kansas City about 4 o'clock. Harris saw him again for about 30 minutes at police headquarters that evening. The next day, Wednesday, June 10, 1964, about 11:30, Detective De-Graffenreid, after explaining to him where and why they were going, took him to the University of Missouri Law School in Kansas City and left him with Professor

Nedrud, interrupting about 3:30 while the three of them ate a sandwich and coffee lunch. Nedrud says he told Walker that he was a lawyer and "if you want a lawyer, please get one." But Walker said that he "would like to talk to you" and so they talked until about 5:30 and during their conversation Walker said that he "wanted to see Dr. Harris." The only incriminating statement testified to by Nedrud was that he said, "Look, I'll tell you some, but it will be your word against mine if we go to court." DeGraffenreid took him to Harris' office and they engaged in "general conversations" for about 45 minutes. Dr. Harris again saw Walker at his office for three or four hours on Thursday. Harris was paid $750 by the Kansas City Police Department for his services in this case and is in its service at least on a part-time basis.

Excerpting, these are the incriminating matters testified to by Harris: He said that as they walked down the cemetery lane Walker began "to speak of some uncertainty whether that was the lane or not." Harris asked "whether he had been a participant in the Biscoe crimes or not." Walker "said that he had not; on one occasion he said that perhaps he did, but that he couldn't remember; he said that 'I feel that I did, but, perhaps, I can't remember.' He said, also, 'perhaps I did, but I wouldn't say that I did.' " But, when he saw him for a short time that evening after returning to the Kansas City jail, "He said that he did not have anything to do with it." The following day, after Walker's talk with Nedrud and his request to again talk to Harris, they talked about "my graduation from a thief to a murderer," and "I said to him, 'Yes, I know; Andy, both you and I know that you committed the Biscoe murders.' " He said, "Yes, I know, Doc, but I can't say anything about it now. * * I said, 'Why did you do it?' He said, 'I don't know; just to keep from being identified I guess.' " When Harris pressed for more details he said "Doc, I can't say anything more about it, now; let me sleep on it." On cross-examination Harris conced-

ed that at one time Walker said, "I'm a thief, but not a murderer." They also discussed the possibility of an insanity plea and talked about blackouts and Walker said, according to Harris, "Perhaps I did it and blacked out and can't remember." When asked if he ever told Walker that "he would go to bat for him" he said, "Yes; I don't know if it was in those words, or not, but I told him that I thought he was sick; this was on Thursday that he had considered whether he was going to sign a confession or not, or tell the details or not, and what he was going to do in regard to his plea; that was one way of going." In this connection there was some discussion of reward money and whether it could be used for his daughter or a home for colored children and "I said that if he decided that he wanted to confess, and sign a statement, that there would be a reward for this, and that perhaps we could see to it that it went to one of these two kinds of places." When pressed as to whether Walker had ever said "I did it," he replied, "He told me he did it."

While Walker, 39, had but two years in high school he had spent many years in prison and was well-read and obviously far above the average in intelligence and cunning. He knew "Well, ninety percent of the Police Department in Kansas City, I know them; they know me by sight" and he categorized them, particularly the Negro detective, DeGraffenreid, "I have no respect for him whatsoever." He had even read a text on polygraph but had a low opinion of its quality and value. He conceded that he slept "some" on Monday night after his arraignment in Kansas City and I believe it was on Tuesday night I got some sleep," and so the claim that he was kept awake by the police continuously for either 36 or 56 hours is without foundation in fact. Furthermore, while he claimed almost continuous interrogation he did not claim that there were any promises, force or lack of food. As to the trip to see Nedrud and Harris he testified

that DeGraffenreid was helping him avoid newspaper reporters. On direct examination he added a piece of information: he said that after his last discharge from the penitentiary, November 1963, he had had for a short time "a brand new Police Positive .38" pistol that he came by in a crap game but that gun had previously been checked by police and then vanished.

The state's interrogators, particularly Nedrud and Harris, attempted to employ and follow the in-custody techniques and procedures described in the manuals set forth in the footnotes to Miranda v. State of Arizona, 384 U.S. 450–460, 86 S.Ct. 1602, 16 L.Ed.2d 694, but the important thing here is that Walker was not deceived or misled in the slightest by their most subtle techniques. As with the testimony of Nedrud and Harris as well as Walker's testimony in other respects, it is not necessary to detail everything he had to say on both direct or cross-examination, it is enough to say that the only respect in which he directly contradicted their testimony was that he denied that he ever, either tacitly or directly, admitted the Biscoe murders. While he admitted the circumstantial facts of the trip and his presence in the area, on direct examination he said, "No, I didn't" kill Marion Biscoe. As to Harris' statement that he had said "Perhaps I did it, Doc," he testified that "The closest thing I ever came to saying anything like that would be 'I don't know anything about it.' I mean I said that a number of times to questions people asked me, and I'd say 'I don't know anything about it.' That, in itself—I mean, I don't think they could misconstrue it for that answer, but I never gave them that direct answer like that." As to blackouts he said he told Lieutenant Johnson, they "were talking of blackouts" and "I said I never drank that much * * * I have read quite a bit * * * and I have * * * it might be true enough, but I never read of a person actually blacking out and don't remember anything at all about some-

thing," but "I have never said that I couldn't remember."

But to specifically indicate the character of his encounter, he said on direct examination that in the course of his hours with Professor Nedrud, Nedrud had tried to hypnotize him. This is his description of the attempt: "Well, we had been talking of this particular crime, and he has a little key chain; identification tag with some keys of his; I think he took the chair that I had, and I took another chair, because I was smoking a cigarette; so he told me to think back to the day of the 29th, to the very morning that I got up, and the further I progressed into the day, he commenced waving this chain, and on this little chain he had a little disk; you see these little disks in the back of magazines, used in connection with hypnosis; this little disk had different colors on it; he and I were sitting facing one another, and he was swinging this chain back and forth, and he eventually got to the place where—I think it was about 12 o'clock—in the telling of what I was doing that day, he told me to close my eyes, and, of course, he was telling me that I was getting drowsy, if I wasn't relaxed; at that time, well, most generally—I knew exactly what it was when I seen the chain, what he was trying to do, because I have seen the same thing performed once or twice in Chicago; it kinda amused me * * *." (Professor Nedrud says that he has no knowledge whatever of hypnosis and, of course, did not attempt to hypnotize Walker.) When asked on cross-examination if he had said that he "could kill," he replied: "I didn't tell him that in so many words to any particular case. Now, the explanation to that, if a man is pushed, or put in a corner, I think any man is capable of killing to preserve himself, if he is so put that his life is just put in jeopardy; me, or anybody might, anybody, including a woman; in others words, in jeopardy—, in other words, like self-defense, or something of that kind."

As to Dr. Harris, excerpting again, Walker said, "Well, he starts out to be a real nice fellow; some portions of our conversation—I mean, a person could actually enjoy talking to him if there was something that you have never encountered." At the crux of their longer session: "Of course, he did call me crazy and I told him he was crazy, also, for—of course, we got around to that type of conversation, and he asked me—it is an age-old joke—but he asked me if I was going across the Sahara Desert and seen a battleship, what I would do, and I told him I would take a submarine and sink it. He said, 'how would you come up with a submarine out there in the Sahara Desert,' and I said, 'the same way you got your battleship.' So from then on, I mean, he went to the extreme of even—he knows I like money; I don't think there is a man living that doesn't like a little of it, but he said, 'Well, now, we can possibly work out some way where we can get some of this reward money turned over to your daughter.' I said, 'that will be just fine, you go right ahead and turn it over to my daughter.' "

There would be no point here in summary in analyzing and demonstrating and finally characterizing the conduct of any or all the parties to this particular in-custody interrogation, the circumstances speak for themselves and there was no coerced or compelled, either physical or psychological, self-incrimination. The appellant Walker, well-knowing all his constitutional and other legal rights, knowingly and voluntarily matched wits with his interrogators and in the totality of these circumstances it may not be said that the rules and guidelines of Miranda v. State of Arizona, Davis v. State of North Carolina and Clewis v. State of Texas have been infringed. Aside from their vastly different factual bases and compelling distinguishable inferences, those cases "do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling in-

fluences is, of course, admissible in evidence." Miranda v. State of Arizona, 384 U.S. 1. c. 478, 86 S.Ct. 1630.

For the indicated reasons the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.