**STATE of Missouri, Respondent,**

v.

**David Lee BRANDT, Appellant.**

No. 54585.

Supreme Court of Missouri,
Division No. 1.

May 10, 1971.

Motion for Rehearing or to Transfer to Court
En Banc Denied June 14, 1971.

John C. Danforth, Atty.Gen., Michael L. Boicourt, Asst. Atty. Gen., Jefferson City, for respondent.

Alan G. Kimbrell, Clayton, for appellant.

KELSO JOURNEY, Special Judge.

Defendant-appellant, David Lee Brandt, appeals from the judgment of the Circuit Court of St. Louis County, wherein, upon the jury's verdict, he was sentenced unto the custody of the Department of Corrections for his natural life for the first degree murder of Salvatore Levantino on January 28, 1968.

The facts leading to the event revolved around appellant's wife of five months, Eva Brandt. Eva was the mother and custodian of two daughters born of an earlier marriage. For eighteen months from December, 1965, to May, 1967, Eva lived with the deceased, Salvatore Levantino, without the benefit of marriage. This relationship ended in May of 1967 with a violent fight, following which, Eva, believing she was injured, went to a nearby doughnut shop where appellant worked. She had then been acquainted with appellant for about one month, and he took her to a hospital for treatment. Three months later, Eva and appellant were married. Four months later they separated, and following Eva's initiating telephone calls to him, the deceased came to Eva's home for a meeting that ended with the deceased threatening violence to her and demanding that she meet him that night at a place called La-Cachette. Thereupon Eva took her two daughters to their father's home and returned to her home where she remained. Later the same night deceased returned and when Eva refused him entry he kicked in her screen door. The following morning the deceased telephone Eva at her employment in a tavern called "Jimbo's Lounge" and told her that he should have bombed her house. When she asked him to think of her children being in the home, he threatened to bomb the tavern where she worked. The next day deceased telephoned Eva an

apology for his conduct, and Eva agreed to meet him at her home that night. During the day Eva changed her mind and put a note on her door for deceased to find that explained her absence and her reasons why. On the following morning deceased telephoned Eva again and threatened to "have her face carved up so no one else would want her."

Then on Friday, January 26, 1967, a day or two later, in response to Eva's call, appellant went to Jimbo's Lounge where Eva related to him in detail the events about the deceased kicking in her screen door and his threatening to bomb and to injure her.

Appellant, appearing as a witness in his own behalf in the trial, testified that he took deceased's threats seriously because he knew the deceased had slapped his wife around; was a known police character; he had been told deceased had been convicted of armed robbery; that deceased had a reputation for violence and turbulence; and that he had no doubt the deceased would carry out the threats on his wife. He testified that he felt deceased had no right or reason to threaten his wife or her children; that he called the police and was told they could do nothing concerning the threats; that he loved his wife and he decided that the only way he could prevent injury to her was to kill the deceased.

On cross-examination appellant admitted buying a double-barrel 12-gauge shotgun and some shells from a gun shop and a hacksaw from a hardware store on Friday, January 26, 1967. He took the shotgun to a rented motel room where he cut off most of the barrel and stock "so that it could be carried without detection."

The mother and stepfather of the deceased, Lillian and John Rimmell, testified that on Sunday evening, January 28, 1967, at about 8:20 o'clock P.M., appellant, wearing a hat, coat and sunglasses appeared at their home in Florissant, Missouri, where the deceased also resided, and Mrs. Rimmell answered the doorbell. Appellant asked for the deceased and Mrs. Rimmell replied that her son was not at home and inquired if appellant wanted to leave his name, to which appellant replied "Just say Kelly called," and he left.

Two hours later the same night appellant parked his automobile down the street, turned the lights off and left the motor running on the automobile, and walked to decedent's residence. Mrs. Rimmell saw the appellant through a window coming up the walk and upon her telling her son "that Kelly fellow is here again," the deceased went to the door where appellant inquired "Are you Sam Levantino?", to which deceased replied "That's right." Thereupon, at close range appellant fired one barrel of the sawed-off shotgun at deceased striking him in the stomach and side. The deceased turned and said "Oh, my God, Mother, I've been shot," and fell, whereupon appellant ran to his automobile and drove away without lights, and threw the empty cartridge out along the road.

The deceased was taken to the St. Louis County Hospital where at 11:25 P.M. the same night Detective Robert Binggeli interrogated him about what had happened. Deceased answered that a white male came to the door and shot him with a shotgun; that he did not know who shot him, but described him as being 25 to 26 years old, about five foot six to five seven and weighed about 140 to 145 pounds, and was wearing a black hat, dark sunglasses, and had on a black or a dark blue full-length coat; that he, the deceased, was sitting in the kitchen and the doorbell rang and his mother answered it and called him; that he got up and just as he approached the door the subject stated "Are you Sam Levantino?" and he said "Yes, I am," and with this the subject outside shot him with a shotgun; and that he had no knowledge of why anybody would want to shoot him.

A surgical operation for gunshot wound was performed on the decedent during the same night by a Dr. Harms who removed three pellets and a fiber disc from dece-

dent's wound. A second surgical operation was performed on deceased on January 30, 1967, by Dr. Lawrence G. Oder, who testified that "this operation involved a re-exploration of the abdominal cavity which entailed some debridement of some necrotic muscle of the abdominal wall, both front and back. Subsequent to the surgery he never regained consciousness, never had spontaneous respirations and expired * * * around 11 o'clock in the morning."

The state introduced in evidence several confessions of appellant including a videotape interview in which appellant detailed his killing of the deceased. His confessions confirmed the testimony of other state witnesses. On the witness stand appellant testified that he decided to kill the deceased on Friday, two days before the fateful Sunday, and that he deliberately planned the killing during the following two days. In effect, appellant's testimony showed that he committed the murder in the manner the State's evidence revealed.

■ Appellant insists that the court erred in overruling his motion for judgment of acquittal because the state did not present any expert testimony from a doctor as to the cause of death of the deceased. While proof thereof may be made by the expert opinion of a doctor, opinion evidence is not the only mode of establishing the cause of death. For many years the courts of this state have held that circumstantial evidence of a proper degree of strength is sufficient to prove the death of the person in unlawful homicide cases. State v. Lamb, 28 Mo. 218, 230 (1859); State v. Patterson, 73 Mo. 695, 712 (1881); State v. Henderson, 186 Mo. 473, 85 S.W. 576, 578 (1905); and State v. Poor, 286 Mo. 644, 228 S.W. 810, 815 (1921). The case of North Carolina v. Minton, 234 N.C. 716, 68 S.E.2d 844, 31 A.L.R.2d 682 (1952), expresses our views when it says:

"The law is realistic when it fashions rules of evidence for use in the search for truth. The cause of death may be established in a prosecution for unlawful homicide without the use of expert medical testimony where the facts in evidence are such that every person of average intelligence would know from his own experience or knowledge that the wound was mortal in character. [Citing cases.] There is no proper foundation, however, for a finding by the jury as to the cause of death without expert medical testimony where the cause of death is obscure and an average layman could have no well grounded opinion as to the cause."

In applying these tests to the facts in the instant case, we hold that the evidence, including the gunshot fired by the appellant, the location and nature of the gunshot wound, and the circumstances surrounding the death including appellant's confessions, afford such causal relation between the shooting and the death as to withstand appellant's motion for a judgment of acquittal. There is no merit to appellant's contention that deceased's death may have resulted from the two surgical operations for gunshot wound he underwent for the reason appellant is legally accountable if the direct or immediate cause of death resulted naturally or proximately from his own unlawful act. State v. Cheatham, 340 S.W. 2d 16, 20 (Mo.1960); and 40 C.J.S. Homicide § 11b.

Appellant complains the trial court erred in admitting over his objection certain exhibits consisting of photographs (one with a traced silhouette showing the position of the body), clothing of deceased, rugs and a storm window—all showing bloodstains from the deceased, when appellant had offered to stipulate that decedent was shot in the front door of his house near the abdominal area and that he bled when he was shot.

■ It is well settled that demonstrative evidence of this character is admissible if it tends to connect the accused with the crime, or to prove the identity of the deceased, show the nature of the wound, or throw any relevant light upon a material

matter at issue. State v. Moore, 303 S.W. 2d 60, 65 (Mo.1957). In State v. Spica, 389 S.W.2d 35, 55 (Mo.1965), where defendant had offered to stipulate all matters which could be shown by certain exhibits, this court said:

"The fact that there was oral testimony as to the physical conditions shown by the photographs does not render them inadmissible, * * * and the State having the burden of proving the guilt of the accused beyond a reasonable doubt should not be unduly limited as to the quantum of its proof. * * * The relevant matters shown in the photographs were more graphically presented through the photographs than would have resulted from the words of a stipulation."

Here, at the time these exhibits were admitted into evidence, appellant had entered a not guilty plea. Every issue remained to be proved in the case, and neither the prosecution nor the trial court could anticipate what defenses might be raised. These exhibits corroborated state's witnesses Lillian and John Rimmell that deceased had been wounded in the abdomen at point-blank range by a shotgun in the doorway of his home. The state having the burden of proof beyond a reasonable doubt on the cause of death and the deliberation and intent of the murderer, the trial court did not err in admitting the aforesaid exhibits into evidence.

Appellant insists the court erred in admitting the statements said to have been made by the deceased following the shooting as "dying declarations," because no proper foundation had been laid for their admission as such. The first testimony appellant complaints of is that of officer Noel Clark who testified over objection that as the deceased lay wounded in the doorway of his home about ten minutes after the shooting he asked deceased "if he knew who did it and he said no, and this is as far as he would state." The other testimony complained of in this regard was that of Detective Binggeli set out in the facts herein.

This court in State v. Proctor, 269 S.W. 2d 624, 626, 48 A.L.R.2d 724 (Mo.1954) laid down the formula governing the admission of dying declarations as follows, citations omitted:

"A statement to be admissible as a dying declaration must have been made by the declarant in extremis and in the belief of impending death after hope of recovery has been abandoned. * * * The declaration may be in narrative or question and answer form; and it is the impression of almost immediate death and not the rapid succession of death in fact which renders a declaration admissible. * * * An explanatory statement by the declarant as to the presence of a sense of impending death need not be made in express language. It is sufficient if the sense of impending death and the abandonment of hope of recovery appears by any means. The despair of recovery may be inferred from the circumstances if the facts in evidence support the inference. 'The surrounding circumstances may, and frequently do, speak as loudly as the oral word. It is enough if, from all the circumstances, it satisfactorily appears that such was the condition of the declarant's mind at the time of the declarations. The declarant's belief in imminent death may be inferred from the nature of his condition, his evident danger, the character of his injury, the administration of the last rites of the church, the conduct of the declarant, and other circumstances which indicate his apprehension of imminent death.' * * *

"Whether a statement has been made when declarant was conscious of impending death and after he had abandoned hope of recovery is a question to be determined by the trial court at a preliminary hearing. * * * However, after the trial court has determined on

preliminary hearing 'the character of the statements as dying declarations * * * for the purpose of determining their admissibility,' the ruling of the trial court that the statement is admissible does not have 'the effect of precluding consideration by the jury of the question of declarant's belief when he made the statements * * *.' State v. Custer [336 Mo. 514] 80 S.W.2d [176] 180. The Custer case established the rule in this state that whether a certain statement is in fact a dying declaration is a question for the jury under proper instructions from the court, even though the trial court has so determined on preliminary hearing."

■ The error in admitting incompetent portions of dying declarations is ground for reversal where it is clearly prejudicial to the substantial rights of the accused. State v. Clift, 285 S.W. 706 (Mo.1926). However, the error does not require a reversal where the subject matter of the statement is otherwise before the jury, as where it is admitted by the accused or is testified to by other witnesses or even by the accused himself. 41 C.J.S. § 425, p. 281, n. 42; State v. Seward, 247 S.W. 150, l. c. 153 (Mo.1922).

■ Measured by the restrictive rules of the Proctor case, supra, there is a question in our minds as to the admissibility of that part of the testimony of Detective Binggeli as to deceased's said statement which tended to identify his assailant and to describe the manner in which he was shot. But we do not deem it necessary to go into the question of admissibility of such testimony from that point of view, because the record shows these facts were testified to by other witnesses, and were admitted by appellant himself in his confessions in evidence and in his testimony on the witness stand. Being forbidden to reverse, except for harmful error, we hold that if the admission of this testimony was error, it was damnum absque injuria upon the facts, and disallow it.

■ Appellant contends that the court erred in allowing the state to place his confession before the jury six times. Appellant cites no supporting authority for this contention, and he does not challenge the voluntariness of the confessions nor the sufficiency of the Miranda warning given. The record reveals that the confessions admitting the shooting by appellant were admitted in evidence as follows: (1st) appellant's oral statement made at his home following his arrest; (2nd and 3rd) appellant's more detailed oral statement made at the police station as testified to by two witnesses; (4th and 5th) appellant's signed written statement that was both read to and passed to the jury to view; and (6th) appellant's video-taped interview with the prosecuting attorney was shown to the jury. In the trial the defense interposed no objection to any of these confessions on the ground they were repetitious. In testifying to appellant's oral statements some witnesses recalled different details than others, and the written statement and video-taped interview, while substantially the same, did contain some factual details not included in the other. We find there was no error in admitting the various confessions under these circumstances. Had any of the confessions been erroneously admitted as being repetitious, such error was cured by appellant's trial testimony in which he again related essentially the same facts. State v. Walker, 416 S.W.2d 134, 140 (Mo.1967); and State v. Hacker, Mo. Sup., 291 S.W.2d 155 [9] (Mo.1956).

Appellant's remaining contention is that his motion to suppress the introduction into evidence of the hat, coat, shotgun, sunglasses and statements taken from him was erroneously overruled because it was not shown that his warrantless arrest was with probable cause, and therefore these items and statements were the "poisonous fruits" of an illegal search and seizure. In support of this contention appellant relies on the cases of United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), and Wong Sun v. United States, 371 U.S.

471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), among others.

The record showed that three police officers of the City of Florissant, while investigating the shooting of the deceased and acting on information supplied by three or four different people including Eva Brandt, appellant's wife, proceeded to the home of the appellant and his parents at 5:30 o'clock the morning following the shooting, for the purpose of arresting appellant for assault to kill the deceased. Two of the officers, with one dressed in a police uniform, went to the door and rang the doorbell. Appellant opened the door and the officers identified themselves as officers and asked if he was David Brandt, to which appellant replied in the affirmative. The two officers then stepped inside the house and placed appellant under arrest, and as they did so they seized the hat and coat in question hanging on a rack to the right of the door they had entered which became in plain view to them after they had stepped inside. Appellant indicated that his father was ill with heart trouble, and at his request they all moved to the outside of the house where the Miranda warning was read to appellant. Appellant said he did not want an attorney and in answer to the officers' questions confessed to the shooting of the deceased and related many of the details of the event including the fact that his father's automobile parked nearby contained the shotgun and the sunglasses he had used. The shotgun and sunglasses were seized by the officers after both appellant and his father gave their consent to the search of the automobile by executing and delivering a printed form for the same to the officers. All of these items and appellant's statements were admitted into evidence before the jury after the motion for suppression had been overruled and over further objections made and overruled in the trial.

■ In the hearing on the motion to suppress it was shown that appellant's arrest and the search were without either an arrest or search warrant. Under these circumstances the burden of showing probable cause for the arrest and search was upon the state. United States v. Jeffers, supra, and State v. Witherspoon, 460 S.W.2d 281 (Mo.1970). In the instant case, aside from the state's showing the officers making the arrest and search acted on information "By talking with three or four different people," no further supporting facts were shown as is required for a constitutional arrest and search. Aguilar v. Texas, 378 U. S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The trial court, apparently relying on the language of State v. Gailes, 428 S.W.2d 555, 559 (Mo.1968), expressly announced during the hearing that the burden of proof to show an unlawful arrest and seizure was upon the appellant, and no effort was made by the state to develop the factual basis for appellant's arrest and the search. Since Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the decisions of federal courts overlay and govern state officers' conduct in the field of search and seizure, and therefore the burden of proof principle announced in States v. Gailes, supra, was not applicable to the factual situation here presented.

In disposing of this case on this point we have given serious consideration to vacating the judgment of the trial court and remanding this case with directions for that court to conduct an evidentiary hearing of the factual basis that led to appellant's arrest and his confessions, and to take appropriate action accordingly. Such procedure was employed in Morales v. New York, 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed. 2d 299 (1969) where the trial court was directed by the appellate court to conduct a further after-trial hearing to determine whether or not probable cause existed. However, upon considering the particular facts of this case, including appellant's consent search of the automobile, his obvious deliberation during the elapsed time between his arrest and his repeated statements including his testimony in the trial

as a witness in which he admitted the shooting of deceased (five months), we do not believe the contention here involved would constitute prejudicial error and hence no further hearing on the motion to suppress is required.

For these reasons the judgment is affirmed.

SEILER, P. J., and HOLMAN, J., concur.

BARDGETT, J., not participating because not a member of the court when cause was submitted.