

# Missouri Court of Appeals

## Southern District

### Division Two

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | No. SD35688 |
| | ) | Filed: May 15, 2020 |
| CHRISTOPHER L. PASCHALL, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

APPEAL FROM THE CIRCUIT COURT OF NEWTON COUNTY

Honorable Jack Goodman, Special Judge

**<u>AFFIRMED</u>**

Christopher Paschall (Defendant) was charged by amended information, as a prior and persistent offender, with two counts of first-degree murder, three counts of armed criminal action (ACA), and one count of parental kidnapping. *See* § 565.020 RSMo (2000); § 571.015 RSMo (2000); § 565.153 RSMo Cum. Supp. (2014). These six charges were based upon allegations that: (1) Defendant knowingly shot and killed Casey Brace, the mother of his two children (Mother); (2) Defendant knowingly shot and killed Mother's grandfather, Herbert Townsend (Grandfather); and (3) Defendant kidnapped his youngest child (Child). After a jury trial, Defendant was found guilty on all charges. He was sentenced to imprisonment terms of two life sentences without parole for the murder

convictions; 60 years, 20 years and 90 years for the ACA convictions; and 7 years for the kidnapping conviction. All sentences were to run consecutively.

Defendant presents one point for decision. He contends the trial court erred by admitting testimony from two witnesses that Grandfather told them the person who shot him was Defendant. According to Defendant, "the statements were inadmissible hearsay and did not fall into the dying declaration exception[.]" Finding no merit to this argument, we affirm.

### Factual and Procedural Background

We view the evidence and all reasonable inferences derived therefrom in the light most favorable to the verdict. *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). All contrary evidence and inferences are disregarded. *Id*. We defer to the fact-finder's "superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." *State v. Lopez-McCurdy*, 266 S.W.3d 874, 876 (Mo. App. 2008). Viewed from this perspective, the following evidence was adduced at trial.

Defendant and Mother had two children together. Child was born in August 2012. The couple initially lived in Springdale, Arkansas. The relationship soured, and Mother left with the children. In September 2014, Mother moved into the home of her mother, Cathy Townsend (Cathy), who lived in Washburn, Missouri.

Between October 2014 and early January 2015, Defendant sent numerous text messages to Mother. Defendant asked Mother to talk to him and expressed a desire to resume their relationship. He made several requests for a meeting. He also expressed anger about not being able to talk to his children. Mother rebuffed Defendant's requests.

On January 5, 2015, Cathy was driving in Cassville, Missouri at about 8:30 in the morning. She encountered Defendant, who was driving a Nissan Rogue. Cathy had an order of protection in effect against Defendant, and she was concerned enough to call law enforcement and to call Mother. Cathy arrived home about 9:00 a.m. to find Barry County Sheriff's Deputy Bill Watkins (Deputy Watkins) talking to Mother. Deputy Watkins asked his partner to patrol the area while he responded to an incident at the other end of the county.

Cathy left the house again and went to Monett, Missouri. She arrived home about noon. About a half hour later, Mother left with Child to visit Grandfather, who lived about a mile away. Mother had gone there to help Grandfather with an issue concerning his Dish Network account. Mother's phone records showed that she called Dish at 12:51 p.m.

About 1:30 p.m., a 911 call was placed from a landline phone at Grandfather's address. The male voice on the other end was barely audible, but could be heard to haltingly ask for an ambulance to be sent. The operator disconnected the call after getting no further response. She made repeated attempts to call the number back, but got a busy signal.

Deputy Watkins was dispatched to Grandfather's house. He found Mother's body lying on the floor near the rear door. Deputy Watkins checked for a pulse and did not find one. Various items were strewn around, suggesting a struggle. Smears of blood tracked across the living room from the fireplace to a bar separating the living room from the kitchen. A large smear of blood sat below the bar, where a landline phone had been knocked off and disconnected from its base.

Deputy Watkins heard moaning from the other side of the room. He looked over to see Grandfather lift up off the floor and point a rifle at him. Deputy Watkins took cover behind the furniture. He heard a thump a few seconds later. Deputy Watkins looked and saw that the rifle had hit the floor, and that Grandfather was lying on his back. Deputy Watkins could see that Grandfather was severely injured.

When Deputy Watkins approached, he saw that Grandfather's face was covered with blood and that he might have had a bullet wound over his right eye. The deputy asked Grandfather if he could tell him what happened. Grandfather was unable to respond. Deputy Watkins then asked Grandfather who had injured him. He answered that it was Defendant. The deputy, unsure of where the suspect might be, then stood up and pulled his revolver. He called dispatch and requested that back-up officers be sent to the house. Deputy Watkins told the dispatcher that Defendant was the suspect. The deputy gave Defendant's name to the sheriff when he arrived on the scene. Deputy Watkins later returned to the sheriff's department and typed out a probable cause affidavit for Defendant's arrest.

EMT Tyler Matchett (Matchett) also responded to a dispatch to Grandfather's house. Matchett found Grandfather lying on his left side in a semi-fetal position. Matchett saw several injuries and also saw blood on Grandfather's shirt, and blood coming out of his mouth. Grandfather was groaning. Matchett asked Grandfather a number of questions, such as his name and where he was injured. Grandfather could not answer those questions, and only groaned. Matchett asked those questions to stimulate Grandfather and keep him breathing.

Deputy Watkins, with his gun at the ready, told Matchett to watch his back because he did not know if the shooter was still there. Concerned about the safety of himself and Grandfather, Matchett asked Grandfather who shot him. Matchett said that Grandfather "mumbled something that was unintelligible and then took a very deep breath and in a very animated way said, Paschall." Matchett observed that Grandfather's demeanor then changed, and he became unstable. His body relaxed, his respirations changed, and his level of consciousness changed. Grandfather's condition worsened, and "[i]t was very apparent that something dire was fixing to happen." Grandfather was immediately placed in the ambulance. He was placed on a helicopter that airlifted him to a hospital, where he died. Matchett returned to the house and told law enforcement officers about Grandfather's statement.

Cathy received a call from a relative who said something was wrong at Grandfather's house. When Cathy arrived there, she asked the officers about Child. Until then, the officers had been unaware that a child had been in the house. Cathy gave officers a picture of Child, and an Amber Alert was issued.

Defendant took Child to his parents' home in Springdale that same day. He first went upstairs to pack a backpack. Springdale police arrived shortly thereafter and arrested Defendant. The police had been alerted to go to that location after a ping of Defendant's cellphone number showed that the cellphone was at the house.

An autopsy showed that Mother died from a gunshot wound to the back of her head that cut her spinal cord. She was also shot in the right breast and the left shoulder.

Grandfather was shot six times. He was shot in the head twice. One of the gunshots resulted in a flesh wound below the right eyebrow, while the other entered Grandfather's

5

forehead above that eyebrow. That bullet went through a part of Grandfather's brain and caused his right eye to explode. The bullet traveled into the sinus, causing bleeding that would have gone down into Grandfather's nose and throat. Finally, the bullet traveled through Grandfather's voice box and windpipe, and hit his left lung before it eventually lodged in his chest. The damage to the voice box and windpipe would have made it difficult for Grandfather to make vocal sounds. The damage to the lung caused bleeding that pressed down on the lung and could have caused leakage of air. Grandfather was also shot in the chest, right elbow, left forearm, and his left shoulder, with that bullet coming to rest in his chest. The gunshot wounds to the chest caused his death.

The bullets recovered from each victim were .38 caliber. Grandfather owned a .38-caliber revolver that he normally kept on top of a gun safe. The gun and the holster in which it was kept were missing after the murders.

At the conclusion of the trial, the jury found Defendant guilty on all charges. This appeal followed. Additional facts will be included below as we address Defendant's single point on appeal.

**Discussion and Decision**

Defendant challenges the admission of Grandfather's statements made to Deputy Watkins and Matchett that identified Defendant as the shooter. Procedurally, the following facts are relevant to this issue.

Prior to the presentation of testimony about this issue at trial, defense counsel argued that Grandfather's statements were inadmissible hearsay and did not fall into the dying-declaration exception. Counsel argued there was no indication "that [Grandfather] made these statements in anticipation of his demise." Before the trial court ruled on

6

admissibility of the statements, the court required the State to establish an adequate foundation to admit the statements. The State made an offer of proof outside the presence of the jury with Deputy Watkins and Matchett. Both witnesses presented substantially the same testimony as recounted above. Deputy Watkins also told the court that he had never, in his experience as a law enforcement officer, seen anyone in as bad a shape as Grandfather. The court found that an adequate foundation had been laid to admit Grandfather's statements made to both witnesses. Deputy Watkins and Matchett then testified about Grandfather's statements.[1]

We review a trial court's decision to admit evidence for abuse of discretion. *State v. Blurton*, 484 S.W.3d 758, 769 (Mo. banc 2016). An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. *Id*.; *State v. Winfrey*, 337 S.W.3d 1, 5 (Mo. banc 2011).

Defendant contends the statements were inadmissible hearsay and did not fall into the dying-declaration exception because "there was insufficient evidence for the court to find that at the time [Grandfather] made the statements he believed that his death was imminent and that there was no hope of recovery[.]" We disagree.

For a statement to be admissible as a dying declaration, it must have been made by the declarant while that person believed death was imminent and there was no hope of

---

[1] This issue is preserved for our review. Defense counsel properly objected and renewed his objection on the same ground when he moved for a new trial. *See State v. Lloyd*, 205 S.W.3d 893, 900 n.5 (Mo. App. 2006) (to preserve an evidentiary issue for appeal, there must be an objection giving the grounds at the time the evidence is sought to be introduced, and the same objection must be renewed in the motion for new trial).

recovery. ***State v. Smith***, 32 S.W.3d 532, 547 (Mo. banc 2000). The declaration may be in narrative or question-and-answer form, and it is the impression of almost immediate death, and not the rapid succession of death in fact, which renders such a statement admissible. ***State v. Brandt***, 467 S.W.2d 948, 952 (Mo. 1971). The State is allowed to demonstrate such a belief by any means. ***Smith***, 32 S.W.3d at 547. A statement is admissible if it satisfactorily appears from the surrounding circumstances that the declarant believed death was imminent at the time of the statement. ***Id***. In determining whether a statement was properly admitted as a dying declaration, the evidence is viewed in the light most favorable to the trial court's ruling. ***State v. Minner***, 311 S.W.3d 313, 320 (Mo. App. 2010).

While Grandfather did not make any direct statements reflecting his belief that he was dying, it is not necessary that the declarant so state or that death immediately follow the declaration. ***State v. Woodard***, 521 S.W.2d 498, 500 (Mo. App. 1975). The declarant's subjective belief of death "may be inferred from the declarant's condition and other circumstances which indicate his apprehension of imminent death." ***State v. Mahone***, 699 S.W.2d 60, 62 (Mo. App. 1985); ***State v. Hayes***, 88 S.W.3d 47, 63 (Mo. App. 2002). Thus, in the absence of an express statement, a declarant's state of mind can be inferred from objective facts such as the nature and extent of the inflicted wounds, the conduct of the declarant, and any and all circumstances that reveal his apprehension of impending death and abandonment of hope for recovery. ***Woodard***, 521 S.W.2d at 500; *see, e.g.*, ***Minner***, 311 S.W.3d at 320 (circumstances of blood-spattered crime scene in complete disarray, along with officer's observations of the victim's serious injuries, heavy bleeding and ashen appearance, supported a reasonable inference that the victim believed he was dying).

Here, viewed in the light most favorable to the trial court's ruling, there was sufficient evidence for the trial court to reasonably infer that Grandfather believed he was dying when he identified Defendant. As an initial matter, the evidence showed a crime scene in disarray. *See Minner*, 311 S.W.3d at 320. Mother's dead body lay on one end of the living room, with various items strewn around suggesting a struggle. Smears of blood tracked across the living room from the fireplace to the bar, where a landline phone had been knocked off and disconnected from its base. The reasonable inference was that Grandfather had dragged himself across the room to call for help, aware he had been shot and was bleeding heavily.

Further, the witnesses' observations of Grandfather's injuries also supported the reasonable inference that Grandfather had an apprehension of imminent death and abandonment of hope for recovery when he made the statements. *See id*. Matchett saw multiple injuries and "multiple blood spots." Grandfather was bleeding from his mouth. Matchett testified that Grandfather appeared very seriously injured. Deputy Watkins also observed that Grandfather was seriously injured. His face was covered in blood, and it appeared he might have had a bullet wound over his right eye. Deputy Watkins testified that, in over twelve years as a law enforcement officer, he had never seen anyone in as bad a shape as Grandfather. *See id*.; *see also Mahone*, 699 S.W.2d at 62 (foundation for dying declaration was sufficient, considering declarant's "physical condition at the time of the statement was that of a man gravely wounded lapsing in and out of consciousness with massive internal bleeding").

Moreover, the considerable effort that Grandfather made to identify Defendant as the shooter is indicative of a belief that Grandfather did not have long to live, and thus

9

needed to identify his assailant while he had the chance. Grandfather, whose voice box and windpipe had been damaged by a bullet, had difficulty talking to the 911 dispatcher. He struggled to respond to questions from both Deputy Watkins and Matchett. It was when he was asked for the identity of the shooter that he gathered the strength to provide that name. Matchett also testified to the sudden change in Grandfather's condition after he identified Defendant. *See Mahone*, 699 S.W.2d at 62 (the statement identifying the defendant as the shooter was made just "prior to his death and was the last utterance he made"); s*ee also State v. Richardson*, 102 S.W.2d 653, 653-56 (Mo. 1937) (noting a change in the declarant's condition, and although conscious, he "grew rapidly weaker and fully realized that death was soon to overtake him"; statements identifying the men who shot him admissible as dying declarations).

In sum, the surrounding circumstances were sufficient to support the trial court's reasonable inference that Grandfather made his statements while believing that death was imminent and that he had no hope of recovery. *See Smith*, 32 S.W.3d at 547. The trial court did not abuse its discretion in admitting the statements as dying declarations. Defendant's point is denied, and the judgment of the trial court is affirmed.


JEFFREY W. BATES, C.J. – OPINION AUTHOR

DON E. BURRELL, J. – CONCUR

MARY W. SHEFFIELD, J. – CONCUR


10